argument is 14-1176 InterDigital v. ITC. We've extended the time, so you're taking 14-6 for rebuttal, and the other gentleman on the other side will split it in 10 if that's correct. Mr. Bress, whenever you're ready. Judge Prosten, may it please the Court. I'd like to start with one moment of housekeeping before I move on to the substance, which is that as the Court, I'm sure, saw, Interpreter's brief did not redact the specifics about how the accused products work, and we've confirmed with them that what they discussed in their brief, which is essentially everything that's relevant to this appeal about how the accused products work, is there for public information that we can feel free to discuss in the courtroom today. Thank you. So two years ago, this Court rejected the Commission's claim constructions with regard to the related power ramp-up patents that were issued in that case, where the Commission erroneously imported limitations from the specification, and specifically from the preferred embodiment in that case. The Commission committed the same errors here, and those errors were most blatant with regard to the power ramp-up patents at issue in this case, where the Commission once again imported a limitation here that short codes cannot carry data from the very same preferred embodiment that this Court found to be non-limiting with no justification. I mean, this is neither here nor there, maybe, but this seems quite an unusual claim construction, and we're not even talking about claim language. We're talking about, I mean, we're almost three steps removed from claim language, and it seems quite peculiar. I mean, there's nothing anyone can do about it, and I'm not ascribing any fault to anyone, but this is quite unusual, is it not? Your Honor, I would grant that it is quite unusual, and we're trying to apply this Court's precedence and established law to the unusual circumstances. In this case, of course, the actual claim language is successively sent transmissions. Right, and then that takes us to short codes, and then with respect to short codes, we're talking about data within the short codes. That's right, Your Honor. So this whole claim construction dispute comes down to the data question. It does, Your Honor. The summary of the invention, as well as the abstract, as well as the background section explain that the invention has to do with short codes, and short codes are actually defined in the second sentence of the summary invention in words very similar to how they're defined at the beginning of the abstract, essentially as codes that are shorter in length than regular codes. This Court held in Interdigital I, which is what I'll call the earlier case, that codes are merely a sequence of chips, and the Commission agrees at this point that a code without more can be modulated with data or not modulated with data. Although our Court in that original opinion, I think, said even though they carry no data and are not intended to do so. That's in reference to the codes, right? Your Honor, no. Specifically, that was a reference to short codes, and I'd love to explain that if I may. So the issue, what was at issue in that case was the Commission's claim construction that all of the codes that are mentioned, just the word code, that are mentioned in the claims are spreading codes, and in fact, spread data signals. One of the arguments we made in response to that, or in opposition to that construction, which the Court agreed with, was that that can't really be the right construction, because there are embodiments, including the preferred embodiment in the specification, that have short codes that don't carry data. And if they don't carry data, then they can't be spreading data. Now, all that the Court had to agree with, and all that we had to say, is that some short codes, by virtue of the preferred embodiment, don't carry data. The Court did not have to decide, we did not argue, and the Court didn't decide that all short codes don't carry data. And that's a basic mistake that the Commission has made in this case, whereas part of its justification is it just did here what this Court told it to do. But let me ask you, getting back to the claim construction issue, there's not an argument here that there's a clear and ordinary meaning that short codes may have data and may not have data. So we have a real ambiguity. We don't know, right? Your Honor, I don't think that that's true for the following reason. We know that a code can be modulated or not modulated. The Commission has agreed with us on that, and actually the expert for interveners, Mr. Landing, acknowledged that a code without more can be modulated or not modulated. What we have in the specification, and again it's the second sentence of the Summary of Invention, tells us what a short code is, and in language that this Court views as definitional, it says a short code is. And it describes it as a code that is shorter in length than a regular code and is detectable by the base station. So, no, Your Honor, I would put forward to this Court that that's what a short code is. And since we know that a code can be modulated or unmodulated, then simply a code that is shorter in length than a regular code can also be modulated or not modulated. In fact, the term short code is used 78 different times in the specification. In two of those instances, it's actually defined, as I've noted in the abstract and in the Summary of Invention, in ways that are broad and that include no data limitation. The only place in the specification, there's one sentence that's talking about preferred embodiment. Where after it lays out what a short code is in the very same way that it's defined in the Summary of Invention, adds the short codes for this purpose carry no data. Now, their entire argument, their entire position is saying that that one sentence about the preferred embodiment limits short codes to codes that are carrying no data. This Court faced a very similar question, actually, in Interdigital I, because one of the claim constructions that was at issue there is the question whether the transmission of short codes, the power of those transmissions, increases continuously or instead increases stepwise in discrete steps. The Commission had found that it increases continuously based on a sentence in the specification about 20 lines down from the language that's at issue here in Column 7. This Court found that that was merely language describing the preferred embodiment and therefore was not limiting of the claims themselves. It's very difficult, and I would say impossible, to say that the language that is at issue here is any more limiting. It equally is describing the very same preferred embodiment. And there's a further point to be made here that I think adds to why it would make no sense to say that the short codes can carry no data. If you look at the claim language itself, all of the claims have language in them to the effect that the sequence of chips does not increase bandwidth. They all have that limiting language in it, and they're just talking about the short codes. Now, that language makes no sense in a world where short codes inherently are not modulated by data because as this Court found on page 1326 of Interdigital I, a code that does not carry data cannot be used to increase bandwidth. So in other words, the limitation that's in these claims, not used to increase bandwidth, would have been entirely superfluous if short codes, by their very definition, don't increase bandwidth. Secondly, and I do believe, contrary to my friends' views in their briefs, that this is quite relevant to the case. One of the ramp-up patents that was at issue in Interdigital I is the 847 patent. And of course, the Commission has based much of its decision-making on how the Court decided that case. But if you look at the 847 patent, it includes claims that have express exclusions of successively sent transmissions, or in that case, it's successively transmitted signals, but same concept, that exclude data. There would be no reason to have claim language saying that certain of the claims' short codes exclude data if it was excluded inherently as a matter of what short codes are. So we've got both the fact that we've got a broad definition within the specification itself telling us what a short code is in the summary of the invention, where it is talking about the present invention. But that definition doesn't really tell us anything about whether it modulates that or not. But what it tells us, Your Honor, is that all we're telling you that a short code is, is a code, which again can modulate or not modulate data, we know that, that is shorter in length than a regular code. That's all it tells us, Your Honor. And to impose a limitation on that from one sentence in the preferred embodiment would be inconsistent with interdigital one and would render claim language entirely superfluous. I submit that this is an easy case where what is being asked of this court is completely contrary to this court's black-letter law, that we don't take a one-sentence description of a preferred embodiment and limit the entire claim because of it. It's, this is a far different... I'm not sure anything about this case is easy, but... There's a lot to it, Your Honor, I will grant that. Can we move, you want to move on? Because I want to make sure you cover the other two main issues. And I will, Your Honor. If I can add just one thing for this issue, because it's part of what the Commission's reasoning was. The Commission also found against us because it found, in its view, that our experts conceded that short codes cannot carry data. It's a blatant mischaracterization of what both experts were saying. The two experts both explained very clearly their view that when they were saying that, they were talking about payload data, in other words, the actual telephone call, the data that was being transmitted over the line. They were not talking about set-up content or information, which they didn't believe to be data. And they contrasted the two, and they said that the preambles that are at issue here, those unique signatures, are not data in their view. They're mere information about how to set the call up. And they said, but if you think of that as data, if you, the Commission, decide that those Pratchett preambles are data, then yes, the short codes of the claims carry that as well, or can carry that as well. So there is no disclaimer by our experts. There is no admission by our experts. Our experts said, look, if you think that what the accused products are carrying is data, the short codes carry that as well. The only thing we don't think that they carry is the actual information in the call. And they explained the reason for that as well. So it's not just sort of a general denial. They explained that the reason that payload data can't be used in the short codes is, when you're talking on a phone, the base station can't know ahead of time exactly what you're going to say. And for a short code to function, it's got to synchronize up with the base station. So the base station has to know what it's going to be told. But if the information that it's going to be told, in this case the Pratchett preambles, is just you're going to be told that one of 16 different signatures is coming your way, you can know ahead of time what those 16 are, and you can attribute a meaning to which one of the 16 comes. For example, this is a 911 call. So known data of that sort, if you will, that's being sent can be part of a short code, as our experts explained. There is not only no admission by our experts. Our experts both testified very specifically at 30177-82 and at 3997, respectively, that short codes under the Commission's definition of data can carry data. Now if I may move on to power control patents. The Commission committed the same error with regard to these patents, although I'll acknowledge not as blatantly. In these as well, you've got claim language, and I'm talking specifically here about the language in, for example, claims 13 and 26, that says that a power transmission level is adjusted in response to the same power control bits, plural, in the series. Are you reading from the specification? I'm reading from the claim language itself, Your Honor. So if you take a look at claim 7, just as an example, the language that I'm referring to is the language that says that a power transmission level is adjusted in response to. And it's in response to, so you've got a singular, the power control level, is adjusted in response to the plural series of bits. What that tells us is that you can have a multi-bit command. You can have a command, for example, where the base station is waiting to hear five zeros. And if it hears five zeros, then it will decrease power. Or, for instance, waiting to hear five ones, in which case it would increase power. So that level, singular, is being adjusted in response to the series of bits, plural. The ordinary reading of that would encompass, as I've noted, multi-bit commands. And you've got stronger language with regard to this patent than you did in your earlier patents in the specification, right? Your Honor, I would acknowledge that, and I would acknowledge that that's what makes this one a closer case than power ramp-up, which, as I said, I think is actually a pretty easy case against reading and limitations. In this one, where I'd say that the error is, Your Honor, is as follows. When you look at the detailed description of the preferred embodiments, you've got kind of a tripartite structure in certain places, and the Commission describes this well in its brief. In certain places, you've got language that makes clear that what's being talked about is the present invention, because it uses that language and says so. You've got other places where it's quite clear that what it's talking about is exemplary, and merely exemplary, and it says that, too. The language that the Commission relied on, saying that you can only have a single bit of information, in other words, only single-bit commands, falls within neither of those. I think the best reading is they're talking about exemplary items. In fact, the key sentence on which they rely, the sentence where the word always is used, falls within a discussion of Figures 3 and Figures 4, which specifically are called out to be merely exemplary. So we believe that certainly the best reading of this is that that language, single bit of information, where it comes up is merely describing examples. But even if there's doubt about that, that doubt would have to be quite grave indeed, because you would need clear and unmistakable evidence in order to overcome the language of Claims 13 and 26, as we've discussed, which is previewed by Claim 7. I think this case is different from SkinMedica, Your Honor, one that we met earlier on, in the sense that in SkinMedica, every single time the particular method that the accused products used was mentioned within the specification, it was contrasted with the method that was called out in the claim language, and that was four times. In this case, the language of bit and bits comes up a lot in the specification. It's used in the singular about 32 times. It's used in the plural in the sense of series of bits or bit streams 13 times. And certainly we'll acknowledge that where they are describing specifically how the bits work, they do use as examples single bit of information, and that is consistent with the language of some of the claims. For example, Claim 1 uses bit singular. But that's inconsistent with how it's used in Claim 7, Claims 13, and 26. So you not only have a movement away from the plain language in this case, you've got a movement that also is contrary to the concept of claim differentiation. Typically, we apply or we don't apply claim differentiation, but it's in the context of dependent and independent claims. And here you're kind of applying it for independent, different independent claims. Your Honor, what this court has said, and I'll acknowledge this court's statements, that you have the strongest claim differentiation arguments in circumstances where you've got an independent claim and a dependent claim. And that's what this court has said. But in other cases, like Curtis Wright, this court has found that claim differentiation principles nonetheless apply. And let's face it, all the claim differentiation principles are really talking about is that you're rendering language of the claim superfluous. And that's really our point on that. Your Honor, it looks like I'm just about done with my time that I've got for my opening. Why don't you take a minute or two and tell us about the final issue, and then we'll restore some time. Certainly. The Dumont patent. I guess my question there is, I mean, it seems quite straightforward. The ALJ didn't spend a lot of time on this. He just said there was one question about almost a definitional question. They used your claim construction. They used your expert's definitional statement. End of story. Why is that wrong? Well, Your Honor, we certainly agree with the claim construction, which the ALJ came to based on the description of the present invention. Where we think that he went wrong again was taking, in some ways this is reminiscent of the issue we discussed earlier, where there are experts taking a one-liner from a transcript and turning it into an admission that it wasn't. So the language, certainly the one-liner, cuts in the direction the commission found, which is equating use with allocate with assign. But if you go back just a few pages, where the expert is explaining what he means by those concepts, he's not really equating them. So if you look particularly at page 30497 of the JA, the question is, why do you say the subscriber unit is allocating the bandwidth? The answer is, well, the wireless bandwidth is allocated only when there is actual data present from the terminal. The unit, either the mobile or the base, the mobile is the one knows whether there's data it has to transmit or not. The base doesn't know that. In other words, the base doesn't know when the mobile has information to transmit. I've gone through the testimony. But is there anything else in the record that you tried to put in to establish what the definition was? The commission relied on a portion of the expert's testimony. I understand that. But was there anything else you put on? Your Honor, it's a matter of that what we put on was misread by the commission. In other words, all that the testimony makes clear that what's going on here  which has data to send, knows that it has data to send and under this invention is the one that allocates, in other words, decides how many channels it needs. Now, it allocates by using them. There's no question about that and thus the confusion of the language. In other words, if it needs three, it uses those three, thus allocating them. And the distinction between this and the prior art, which was key, is that under the prior art, the subscriber unit would tell the base station, I'm ready to send some data and the base station would say, you get three channels in order to do that. Under the invention here, what's going on is that the base station assigns a number of channels to the subscriber unit and the subscriber unit decides how many it needs. That's what's being discussed in that testimony and I submit that if the court reads through that testimony, it will understand that that's all that was being said and in fact, equating use and allocate would make no sense of the claim construction that the commission did because the commission said, or the ALJ in this case, said that it is the subscriber unit and not the base station that's doing the allocating. That would be vitiated and frankly meaningless if you just said that allocate means use because of course it's the subscriber unit that's using that which the subscriber unit is using. The entire claim construction is talking about how the channels are allocated for it to use and by equating the two, I do believe it rendered the construction kind of meaningless. Okay. We are a couple minutes ahead. We'll restore three minutes of rebuttal and we'll give you each two more minutes on your side to even things up. Thank you. Now, are you all going to discuss the case in its entirety, each of you, or have you divided up the issues that you're handling? We haven't. We are prepared to discuss any questions the court has. Yes. All right. Good morning and may it please the court. If I may, we come back to the power ramp up patent. We admit that the successively sent transmissions, which is the only limitation at issue, refers to the short code. Now, there is a reason why they heavily contested that at the commission. At the commission, they vigorously argued that the successively sent transmissions should not refer to the short code and there's a reason for that. The reason is because the overwhelming evidence establishes that if the successively sent transmissions is limited to the short code, then those same short codes do not modulate data. And if they don't modulate data, then there is no infringement. That is why they vigorously contested that at the commission. The commission furthered and persuaded. Well, let me ask you, to me, a lot of this, if you apply the rubric that we apply in our cases in terms of clear claim language, when we go to the spec and how heavily we rely on the spec, it's a matter of whether or not there's a clear and ordinary meaning for short codes, in my mind. And therefore, is there, can you point me in the record, is there a clear and ordinary meaning of short code that does not include data? I mean, the clear and ordinary meaning, it can or cannot include data, or is it in your view that it's something narrower? As used in this patent, short code does not modulate data. And the patent explains why. The entire purpose of the invention is they describe the problem they are trying to solve in the specification. And they describe the problem in Figures 5A and in Figures 5. And they describe the problem as a power overshoot. So what they're trying to do is they use a short code to minimize the power overshoot. And the short code they use for that purpose, which is a claimed invention, does not modulate data. That is what the patent teaches. Well, as we all know that we've gone through it and there are really only two sections of the specification that one is able to call out. Well, you say the patent teaches, right? Is it beyond the two items that Mr. Bress and I have been discussing this morning that refer to it? Your Honor, the experts for both sides, both intelligence experts and respondent experts, all the experts agreed that the short codes do not modulate data. That was established below. It was even established in the prior appeal before this Court, where the Court found that these same short codes do not carry data. The Court even went further than that. The Court said they're not even intended to carry data. And that is in reference to the claimed invention. What InterDigital really wants is scope for something they didn't invent. They want patent protection for something they have not invented. One of ordinary skill in the arts reading this patent will understand that the short codes do not modulate data. That is the problem they set up. The problem they describe is a problem of power overshoot by using the full-length access code. And then they explain that to remedy that problem, you use a short code. And they specifically state that the short code used for that purpose, the purpose of the claimed invention, does not modulate data. And one of the reasons why they vigorously contested that at the Commission is because ALS specifically found that if adoption of their interpretation of the short code carrying data will render this invention inoperable. If the short code carries data, then this invention will not work. Because for the invention to work as described, the short code cannot and does not modulate data. That is taught in the specification. It is all the experts agreed. There was no expert who testified to the contrary. And this Court found the same in the prior InterDigital appeal before this Court. So it's all consistent. The only thing that goes against it is the appellant's appeal brief. If I may briefly turn to the power control patent. I mean, the power control patent. There, the patentees acted as their own ethnographers and defined the expert scope of how power control information is conveyed. It specifically states that power control is always conveyed as a single bit. And it's a single bit either to increase or decrease the power. So power control command is conveyed as a single bit. It's an expert definition, and the expert definition has to govern under this Court's rule. Well, if you look at where it is in the patent, though, it's not quite as clear that it's a definition. Is that... There's too many patents here. But in the 406, Mr. Brett was referring to it earlier. The always language, which we have focused on. And it's in column nine. And it's in the context of discussing... It's discussing the power control parameters. And it's a definitional sentence because it states that APC information, which is the power control information, is always conveyed as a single bit of information. I mean, they use the word always. And the specification is actually replete with references to single bit, one bit. It's not just this disclosure. The specification further teaches that the power control information is conveyed in single bit either to increase or to decrease. And that's in column six, lines 47 to 51. So it's replete with references to that. I'm sorry, this is in your brief. Column six, lines 47 to 51. Well, I don't know if two constitutes replete. Oh, no, there are more than that. More than two. But we can keep going. And if we look at also column nine, lines eight to 11, I already mentioned that, lines 61 to 64. In the 332 patents, we have columns 64, lines 12 and 13, columns 66, lines 42 to 45. We also have in the 332 patents, columns 64, lines 11 to 13. So the specifications are replete with references to single bit, one bit, and there's no disclosure anywhere in the patents where power control information is conveyed as a multi-bit, which is what happens in the respondent product. If I may quickly turn to the 970 patent. With respect to that patent, Interdigital's argument is that the base station can play no role. That restriction is not present in the patent. All the patent requires is for the subscriber unit to allocate, and their own experts testify that allocate, assign, allocate and assign and use have the same meaning. The expert's testimony was unambiguous. I know Mr. Bress mentioned that the testimony was ambiguous. The testimony is clear. The expert stated, I mean, counsel for respondent asking repeatedly, allocate, assign and use, do they mean the same thing? And the expert repeated that yes, they do mean the same thing. And this was in connection with infringement, in connection with this infringement testimony. Is this on 304, 98 and 99 that you're referring to? Is that the testimony? Not that I think it's ambiguous, but it's not quite as clear as I read it to you. The answer is my definition of assign is to use the channel, actually, question. So allocate is use, answer, allocate, use, assign, yes. Yes. And our view is that that is unambiguous. The expert was unequivocal. And this was in connection to the infringement finding. It's quite the same, because the commission adopted it as a digital construction. And the expert testified that under that construction, allocate and use and assign have the same meaning. And so the commission relied on that to find non-infringement. I mean, to find the patent invalid, excuse me, 970. I don't have extra time, but if the court has no questions, I will. Thank you. Thank you. May it please the court, I'm going to talk about all three of the patent groups for both interveners. I want to start, as everyone has, with the power ramp-up. And I want to follow up, start, Judge Post, with what you started with Mr. Bress, which was we have this interesting situation where we've left long ago the language of the claims, and there's no longer an argument that we should be applying the plain meaning of the claim language. That was a position InterDigital took at the below, argued reciprocally against the use of short codes in the construction, did not prevail for reasons that should be very clear, and now abandoned that. And there's some important consequences, we believe, that come from abandoning that position. And the first thing is, consequently, we should not be led into the trap of believing that this case is about now construing the plain meaning of the word short code. And there are two reasons for that, Your Honor, and they have to do with how the word in concept is described as the invention. In columns 1 and 3, where we specifically say what the invention is, and this is the limiting language. Is this an 830? That's right. This is the 830 patent at column 1, lines 29 to 32, and column 3, lines 18 to 24, we are told that the invention, the invention is the use of short codes, the utilizations of the word, the verb used in that sentence. So the invention isn't short codes. The invention is the use of short codes. And that is one of the reasons why I think, for very good reasons, they made the decision to abandon the argument that we should be given the broadest possible meaning to the word successively sent transmissions. When we then look to the question of whether or not the use of short codes, which is defined in this invention, has any use other than carrying no data, we are told explicitly in column 7, a sentence that reads, the short codes used for this purpose carries no data. Now what purpose are they talking about? This is the paragraph that begins the preferred embodiment of the present invention uses a two-step process. And then describes some details of the two-step process. It concludes with the sentence unqualified by the statement the preferred embodiment uses. It simply says the short codes used for this purpose. This purpose is the purpose of the present invention. Now let me make an important point about the so-called preferred embodiment. There is only one embodiment in the patent that uses short codes, which are described as the invention. That's the embodiment described in figure 7. There is an embodiment described in figure 5, but it is not an embodiment of the invention. It is an embodiment of the problem the invention purports to solve. There is no description, no hint, no any evidence at all to someone reading this that the short codes used in this invention carry data. Now this was the position presented to the commission when it was reviewing the record. Where we have a construction that calls out by the specification for the use of short codes because that was what was described in the invention. Text in the patent that says when we use short codes in this invention they carry no data. What do the experts have to say? Now in this case both experts were offered by both sides opinions as to what these claim terms mean and how they should be applied. An interdigitals expert gave testimony about the proposed construction using short codes. Now this was a construction that at the time he opposed vigorously. And my colleague Mr. Bress suggested that his explanation was that we're talking about the payload data of the telephone call versus the payload data associated with setting up the call. That distinction cannot be found in these pages. If you look at the record where he testified that the short codes of the patent do not carry data, it begins at page 3176. In the very beginning it's very clear we're talking about claim language. This is a cross-examination on his opinions about the scope of the claims. And it is in the course of that that we learn two things and it goes on through pages 30-182. He says two things. He says, I'm going to concede that short codes don't modulate data. But what I'm going to fuss with you, he in essence said, is what I'm disputing is whether or not what the accused products do is modulate the data. He tries to draw a distinction between conveying information and modulating data. Those are two different concepts. A red light at a traffic stop conveys information. But it's not a signal modulated by data. It is simply a red light. A signal modulated by data can be data that is spread by a spreading code or, in the example of the accused technology, information about access service modulated, changed by a spreading code. Now what is transmitted when a signal is actually modulated is data of some use altered or changed by some other signal, a scrambling code or a spreading code, which is then received and has to be extracted. It is as if you're going to send the number 4 to the base station. But you take the number 4 and you add the number 6 to it and what the base station receives is the number 10. If the base station knows in advance that you have added the number 6, it can subtract 6 and get 4, but all you've sent is 10. That's an example of a signal modulated by data. And there is no hint whatsoever in this patent, and the expert ultimately conceded this through those pages of cross-examination, that all he's talking about is, well, the patent discloses a red light or a green light, but there's not disclosed modulated by data. They put all their cards on arguing a factual question, which was, is the accused product more like the red light, green light, information only, or is it modulated by data? There, the factual finding by the experts, in view of conflicting testimony from the experts, was resolved in the respondent's favor against InterDigital. And they don't even contest that finding, that, in fact, the accused Pratt's Preamble is a result of a signature modulated by a scrambling code, which has to be demodulated and extracted at the base station. There is no hint of that process anywhere in this patent. And I want to mention one other thing about this that goes beyond what the ITC has noted. Even if InterDigital were to convince you that now that we have left the language reasonable, the question of what's the plain meaning of words, we're talking about what do the experts say and what is taught by this patent about how the short codes are used, which is described as the invention. We have the finding by the administrative law judge that if the patents were as broad as InterDigital claimed, they were invalid for lack of written description support. That's a crucially important factor of this appeal, Your Honors, because the ITC rules are explicit. If one of those contingent findings is made by an administrative law judge and you don't agree with it, you have to explicitly list it on your petition for review. Otherwise, it is waived. And there is a list of their contentions of the issues they want to review, and it's found at page A5-608 and 609. And the written description validity finding, the contingent alternative finding made by the administrative law judge, is not present in that list. And the ITC regulations could not be clearer that if it's not on that list, it is gone. And so were this court to say we're going to find a different claim construction and give a broader... Are you talking about just the first set of patents? Yes, this is just on the power ramp-up patents. And so, frankly, reversing... Did you make this argument in your brief? It is in our brief, absolutely, Your Honor. And that means that a further pursuit of this is futile. I want to touch briefly on the power control of patents. There was a great deal of discussion by my colleague and some questions about it about the claims that refer to multiple bits being sent. That claim language looking in isolation might arguably be amenable to a reading of either way. There's no question it has to be read to cover the disclosed embodiment of a single bit. Maybe it does, maybe it doesn't be amenable to a broader construction standing alone. But what we have here is a very clear statement that the power control command is always one bit and no counterexample whatsoever in the patent. No hint that there are other possible embodiments that could explain away the always language. Now, in InterDigital's brief, they argue that there are counterexamples. They point, first of all, to the patent, that claim language we just talked about, which is neither here nor there. It's neither fish nor fowl. They have a see-also cite to some testimony. That testimony does not relate at all to multiple power bits. It relates to multiple data rates, not multiple power bits. So there's not even their own expert did not point to. This is on page 27 of their gray brief. Their expert cannot even point to a counterexample of multiple bits in the patent. And the absence of a counterexample combined with the unequivocal statement always puts the public on notice that to practice this invention, you always use a single bit. My final point, Your Honors, in terms of the 970 patent, the dual-mode patent. And there is actually a point raised in the last three pages of our brief, which is unresponded to by the other side, which is that the Commission got the claim construction wrong. The term being construed is assigned to fiscal channels, deliberately written in the passive voice, not requiring the handset to assign them or the base station to assign them or some other omniscient party to assign them. It doesn't matter under that claim who assigns them. We argued below to the Commission that that was an unduly narrow construction. The Commission disagreed with us, gave it the narrow construction that InterDigital urged. Unfortunately, the prior art also met that requirement. But there is no dispute that if you give that term its plain and ordinary meaning, assigned fiscal channels, irrespective of who does the assigning, this claim is invalid. And because we presented that issue to the Commission, because the Commission addressed it and rejected it, it is absolutely present here for your honors to decide, and InterDigital did not address it at all in its reply brief. Simply ignore it, because we made two arguments, one about how there can't be an infringement under their newest theory, and they said, well, that wasn't before the Commission, and at that point they may have it. But the second argument we made, which was absolutely unequivocal... Your time is up, so you want to finish or something? That'll be my end of my sentence. Your Honor, I'd like to start again with Powell-Rampa. I think that the starting place in this case with regard to short codes and what they mean, Your Honor, has to start with what this Court said in InterDigital I as to what a code means. And what it said in InterDigital was it's a sequence of chips. In that case, they could be spread or not spread. We have total agreement in this case that a code can be modulated or unmodulated. So that's step one. Step two. If we look at the summary of the invention at the first two sentences, and this is column 3, lines 18 through 24, the present invention comprises a novel method of controlling transmission power during the establishment of a channel in a CDMA communication system by utilizing the transmission of a short code from a subscriber unit to a base station. That's the first sentence. So it's about short codes. Second sentence. The short code is a sequence for detection by the base station which is a much shorter period than a conventional spreading code. In other words, a short code is just a code shorter in length than a regular code. So we do start out with plain language that a code can be modulated or unmodulated. A shorter code can be modulated or unmodulated. The only thing that the commission and the interveners point to to say, oh, but there's this data modulation limitation, is one sentence in a description of a preferred embodiment. This court held in Interjudicial 1 that other sentences in that same preferred embodiment are not limiting of the claim. They merely describe aspects of that presently preferred embodiment that are not encompassing the whole of the invention. There's no greater reason to read that sentence to be limiting of what short codes can or can't be than there was in Interdigital 1. The commission here argues, and I'm not going to go into detail, but that the invention would not work if short codes carried data as we've explained. By the way, they said in their brief in 46 and 47 that they disavowed that and weren't relying on it, but today they sought to resuscitate it. We explain in our brief with plentiful citations to our experts that short codes can work if they're modulated by data. That's exactly how the accused products work. They've got short codes that are modulated by 16 different signatures, and which signature they choose tells you something. So we know short codes can be modulated by data. Their argument is, well, the ones in the invention can't be modulated by data, but that just takes them back to the one sentence on which they hang everything. There's no other reason to get there. Third, if everything in that embodiment were limiting, we would know that a cell boundary has to be 30 kilometers. We would know that a pilot code has to be only X length. We would know what the update rate's got to be, the ramp-up rate's got to be, and it's down to a particular number, one decibel per millisecond. Those clearly are not required features of the invention. They're simply aspects, features of a preferred embodiment, again, as this court has recognized. I think we're done. One last thing. Your Honor, one last thing, which is the written description argument that's being made here. As we pointed out in our brief on page 19, we did argue to the commission in our petition for review that that issue, that the written description was sufficient, that the ALJ was wrong on that. Whether that's enough or not enough is really to be determined by the commission on remand with its usual waiver and whether you complied or didn't comply rules. It's certainly nothing for this court to anticipate and decide under Chenery. Thank you, all counsel. And the case is submitted. That concludes our proceedings. All rise.